426

## No. 14,097.

PEOPLE ex rel. ATTORNEY GENERAL *v.* LASKA.
(101 P. [2d] 33)

Decided February 5, 1940.

Mr. BYRON G. ROGERS, Attorney General, Mr. WALTER F. SCHERER, Mr. REID WILLIAMS, Mr. JOSEPH D. ISKOW, Assistants, for petitioner.

Mr. BEN B. LASKA, pro se. Mr. PHILIP HORNBEIN, Mr. LEO S. MOSES, Mr. THEODORE EPSTEIN, for respondent.

*En Banc.*

Mr. Justice Burke delivered the opinion of the court.

Respondent, hereinafter referred to as Laska, an attorney at law of this bar, was informed against by the attorney general in a petition alleging his conviction and sentence in the United States District Court for the western district of Oklahoma under an indictment charging conspiracy to kidnap, and asking his disbarment. Laska admitted the charge, but asserted his innocence and pleaded that the offense was not such under state statutes. To this answer a demurrer was filed and sustained with leave to amend. *People ex rel. v. Laska,* 101 Colo. 221, 72 P. (2d) 693. The answer was amended, repeating the substance of the original, alleging that the federal statute under which the indictment was returned was not in effect at the time of the transaction, that for numerous reasons specified Laska did not have a fair trial, and detailing his version of the facts. A demurrer thereto was overruled and the attorney general, by replication, again demurred, for want of facts, to the answer as a whole and to the several portions thereof, denied new matter, and alleged that Laska was guilty of the acts charged. Thus at issue the cause was referred, for investigation and report, to the Denver district court, where it was assigned to and regularly heard by Hon. Henry S. Lindsley, one of the judges of that court. At that hearing Laska was present, in person and by counsel, and all essential evidence, oral and documentary, was adduced. Thereupon Judge Lindsley reported to this court the proceedings before him and his conclusion that Laska had been accorded a fair trial in Oklahoma and that his guilt had been there fairly and legally established. Thereupon the cause was briefed here and is now finally submitted. Since his sentence Laska has been and now is confined in the federal penitentiary.

The statute under which Laska was indicted is section 408c, 18 U. S. C. A. After conviction he appealed to the United States Circuit Court of Appeals, where the

428

judgment was affirmed. *Laska v. United States,* 82 F. (2d) 672. He then petitioned the United States Supreme Court for review by certiorari and the writ was denied. *Laska v. United States,* 298 U. S. 689, 56 Sup. Ct. 957, 80 L. Ed. 1407. We here omit all further statement of facts. Our former opinion and that of the United States Circuit Court of Appeals, supra, give them in great detail. Suffice it to say that we concur in the latter's conclusion that "If he [Laska] did these things he deliberately entered as black a conspiracy as was ever hatched, and he ought to pay the penalty."

█ In a proceeding of this kind the ultimate question is whether the attorney charged has shown himself an unfit person to be longer entrusted with the privileges and prerogatives of his profession and to further serve as an officer of the court.

On Laska's contention that the statute under which he was indicted was inapplicable, two federal courts have found against him and the United States Supreme Court has, inferentially, affirmed that holding. But the acts charged, if committed, would have here the same result if no statute forbade them. *People v. Weeber,* 26 Colo. 229, 57 Pac. 1079.

█ Whether, technically considered, the question of Laska's guilt, or the fairness of his trial in the United States District Court, or both, are now presented, we consider immaterial. As to the fairness of that trial it has been adjudicated in the proper tribunal and the record thereof has our approval. Were it otherwise and any lingering doubt remained that the Supreme Court of the United States would take jurisdiction and correct such a miscarriage of justice, it seems to us the following cases would put that doubt at rest. *Powell v. Alabama,* 287 U. S. 45, 53 Sup. Ct. 55, 57 L. Ed. 158; *Norris v. Alabama,* 294 U. S. 587, 55 Sup. Ct. 579, 79 L. Ed. 1074. On the question of Laska's guilt of the acts charged, that guilt has been established by a jury and the proper tribunals have found that it was legally established. We

concur in that conclusion but have not contented ourselves therewith. We have examined with care the evidence in the cause and find the verdict amply supported.

Where conviction and sentence occurred in another jurisdiction, for the violation of a statute thereof, the rule that all presumptions favor the judgment still holds. If that violation, as here, involves gross moral turpitude, disbarment, though not mandatory, follows in the absence of an adequate defense. He who asserts a miscarriage of justice has the burden of establishing it. He may, for instance, show the trial so unfair as to rebut the presumption, or establish his innocence by newly discovered evidence. His defense, however, must go to the merits. Mere irregularities and technical errors are unavailing. If the conclusion of gross moral turpitude still stands the presumption remains. This respondent has presented nothing which, in our opinion, removes either the presumption of a fair trial or the presumption of guilt.

The general principles governing and applicable to the foregoing are so familiar, and the authorities stating and reaffirming them so numerous and unanimous as to make further citation superfluous.

The public safety demands that no ability however great, no practice however long or creditable, and no reputation however unblemished, should exculpate a lawyer who thus prostitutes his profession, or temper the judgment which should follow his conviction.

It is accordingly ordered that respondent's name be stricken from the roll of attorneys of this court and that he be, and he hereby is, disbarred from further practicing law in this state.

MR. CHIEF JUSTICE HILLIARD dissents.

The following dissenting opinion was filed April 12, 1940.

MR. CHIEF JUSTICE HILLIARD dissenting.

A proceeding in disbarment. The disciplinary charge

is that in a federal court, respondent was convicted of the "crime of conspiracy to violate the provisions of the Act of Congress, approved June 22, 1932, sections 408 (a) and 408 (c) (18 U. S. C. A.) (conspiracy to violate the Lindberg act relative to kidnaping)," and "sentenced to confinement in a United States penitentiary for a term of ten years." Relator, citing '35 C. S. A., chapter 48, section 533, prayed for summary disbarment. That section, providing punishment in addition to that imposed pursuant to other provisions thereof of those adjudged guilty of felony thereunder, is part of our criminal code. It reads: "Every person convicted of felony shall from thenceforth be disqualified from holding any office of honor, trust or profit under the laws of this state, or practicing as an attorney in any of the courts of this state." Respondent, invoking the philosophy of our cases (*People ex rel. v. Brayton,* 100 Colo. 92, 65 P. (2d) 1438; *People ex rel. v. Edison,* 100 Colo. 574, 69 P. (2d) 246; *People ex rel. v. Burton,* 39 Colo. 164, 88 Pac. 1063, 121 Am. St. Rep. 165), and challenging the summary applicability of the quoted statute in the circumstances here, answered that he was not guilty in fact, and had not had a fair trial in the federal court, explaining in some detail. Relator's general demurrer to respondent's answer was sustained. *People ex rel. v. Laska,* 101 Colo. 221, 72 P. (2d) 693. In the course of our opinion we set forth the weakness of respondent's answer, and observed that neither he nor relator "fully apprehended the doctrine of our decisions in disciplinary proceedings based on conviction of felony in courts other than of Colorado jurisdiction." Undertaking to state the rule with greater clarity we further stated that "where the conviction has been in a court of another jurisdiction, as here, and the attorney whose discipline is sought formally invokes that right, we have deemed it consonant with justice to accord him the privilege of denying his guilt notwithstanding his conviction in a 'foreign' court, and to plead facts and cir-

cumstances reasonably indicating that he did not have a fair trial, * * * and have inquiry made under our supervision." With leave, respondent filed an amended answer to which relator interposed demurrer as before, but by our order of December 2, 1938, the demurrer was overruled.

Shortly stated, therefore, the questions are: 1. Does our primary examination (we are not examining on error) of the respondent's trial show he was accorded fair treatment in the forum of his conviction? 2. Considering that record and the record of our own inquiry, may it justly be said respondent's guilt has been established? If he did not have a fair trial, then this disciplinary proceeding based thereon necessarily should fail; but assuming the trial was fairly conducted, still, and on responsibility not to be shirked, whether respondent was in fact guilty remains to be determined. Unless so resolved, he should not suffer our displeasure. "Otherwise, as we perceive, the judgment of the convicting jurisdiction would operate extraterritorially, and automatically, as if by lawful mandate, require the ministers of justice of another sovereign jurisdiction to visit an added penalty on him, who, prone and helpless before them, denies his guilt and pleads that which indicates his innocence of the change in the court of his trial." *People ex rel. v. Laska, supra.*

My study leads me to conclude that the record of respondent's trial in the forum of his conviction of the crime which is the basis of this presentation, clearly indicates that in the course thereof fundamental and familiar canons of justice were invaded, disregarded, denied; and the record of our direct inquiry not only emphasizes the unfair treatment to which respondent was subjected, but is overwhelmingly convincing that from no reliable source whatever was there any evidence of his guilt.

It is important that the facts be amply stated, and since exiguity of review of the record obtains in the

major opinion I proceed to revelation. July 22, 1933, two armed men, George R. Kelly and Albert L. Bates, Kidnaped Charles F. Urschel from his home in Oklahoma City, Oklahoma, and transported him to Texas, where he was held for ransom. July 30, 1933, the ransom demanded, $200,000, was paid to Kelly in Kansas City, Missouri, and the following day Urschel was released within a few miles of Oklahoma City. Kelly and Bates, of many aliases, noted gun men and general malefactors, as well as those having part in guarding the victim while he was being held for ransom, shortly were apprehended, indicted and convicted under the act of congress mentioned, and are serving life sentences. At this point it seems pertinent to introduce additional characters: Bates' wife, commonly called Clara Feldmann, her adult son, commonly called Ed Feldmann, both masquerading under various assumed names, and Alvin H. Scott, Mrs. Feldmann's brother-in-law. From not later than May 15, 1933, Bates, although frequently absent for indefinite periods, and on undisclosed missions, and his wife and her son, just mentioned, lived at the Corinthian Apartments, 1801 Grant street, Denver, until July 17, 1933, when the wife and her son left for Portland, Oregon, ostensibly to visit relatives. From that date until July 22, 1933, the date of the kidnaping, in which as we have seen, Bates was an active participant, and from July 22, 1933, until August 10, 1933, presently to be emphasized, his whereabouts were unknown; and from July 17, 1933, till August 7, 1933, when Bates' wife accompanied by her son and Scott, her brother-in-law, returned to Denver and took up residence in the Sterling Apartments, 1174 Pearl street. Where they had been does not appear. It does appear that from August 7, 1933, until the night of August 13, 1933, the wife and son — what became of Scott, the brother-in-law, does not appear—lived at the 1174 Pearl street address. During the morning of August 10, 1933, Bates appeared at their apartment, carrying two bags,

one brown, the other not identified. He put the bags "away" in the apartment, partook of breakfast with his family, and shortly left to "see a party." August 12, 1933, Bates was arrested by Denver police officers. In the evening of August 13, 1933, Mrs. Bates received a note from her husband, borne by a jail trusty, as she testified, advising that he was in jail and saying to give the bearer $200 from the brown bag, adding: "There is nothing you can do for me. Move." She destroyed the note. The messenger was paid as directed, and that night at eleven o'clock the wife and her son fled Denver, going to Cheyenne, Wyoming, taking with them the two bags Bates had brought to the apartment. The brown bag contained approximately $90,000 in currency, of the money paid as ransom. Not earlier than August 15, 1933, perhaps a day or so later, Ed Feldmann returned to Denver. In the meantime Bates had contacted respondent, and while evidently at the time of his first interview with respondent Bates did not know on what charge he was being held, and in his talks with respondent spoke only of offenses other than the kidnaping crime, it seems that August 15, 1933, Bates suspected that he was being held as one of the alleged kidnapers. He then acquainted respondent with his apprehensions in that regard and sought his services as an attorney. Respondent evincing a willingness to act in the matter, Bates told him to get in touch with Louis Duran, a Denver resident, and related to Mrs. Bates by marriage, who would be able to make arrangements for the payment of an attorney's fee. Respondent contacted Duran — who in turn communicated with Ed Feldmann — told him Bates was being held on the Urschel kidnaping case, had engaged respondent to represent him and that arrangements to pay respondent a fee should be made. Duran showed Feldmann the building where respondent had his office. Feldmann called on respondent, discussed the case, and, as respondent testified, expressed the belief the necessary money could be raised. Within a day

or so, Feldmann accompanied by Duran, called at respondent's office and placed on respondent's desk what was claimed to be three thousand dollars. Respondent testified to the fact of payment, and the amount thereof, and his testimony was corroborated by Molly O. Edison, Esq., an attorney of this bar, and by Hazel Ohle, respondent's secretary, both of whom witnessed the payment by Feldmann, and at respondent's request counted the money. Feldmann, testifying at respondent's trial in the federal court, denied that he had made any such payment and Duran denied that he was in respondent's office. Mrs. Edison gave her testimony at the same trial. Miss Ohle, by reason of illness, did not appear at the trial, but did testify at the hearing conducted by our direction in this proceeding. Both testified that what purported to be three thousand dollars was twenty-five or thirty dollars short of that sum.

At Bates' trial, September, 1933, respondent appeared as his counsel. Bates did not testify, nor was any evidence offered in his behalf. It is not claimed that it was improper for respondent to represent Bates at his trial, nor that in anything respondent did as attorney for Bates he proceeded other than ethically.

December 14, 1934, in the same federal court, an indictment was returned against Alvin H. Scott, Clara Feldmann, called as well by her many aliases, Ed Feldmann, his aliases being given, Ben B. Laska, respondent here, and James C. Mathers, an Oklahoma lawyer. It was charged that said defendants, together with Kelly and Bates, already mentioned, and Kathryn Thorne Kelly, Harvey J. Bailey, all named as well by their various aliases, Robert G. Shannon, Armon Crawford Shannon and Ora L. Shannon, from the inception of the crime, in its various phases, including the actual kidnaping, were active participants. In short, all those indicted were charged with violating the so-called Lindberg act relative to kidnaping, not simply a particular section of the act. The indictment, after the form of

such accusations, is long and repetitious, and to set it forth at length will require much space; but since the major opinion does not even summarize the indictment, nor give the names of those indicted or their several pleas thereto, or whether any of them testified in the case or to what import, and how they fared at the hands of the court, for comprehensive study I think much remains to be stated. Considering that Mrs. Bates (Clara Feldmann), Ed Feldmann, her son, and Alvin H. Scott, Mrs. Bates' brother-in-law, all pleaded guilty to the charge, and that only the Feldmanns gave testimony against respondent, the indictment is most important. It follows:

"In the District Court of the United States for the Western District of Oklahoma

No. 11024.

"United States of America, Plaintiff, vs.
"Alvin H. Scott; Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth Johnson, alias Doris Roberts, alias Doris Mansfield; Edward George Feldman, alias Edward George Feldmann, alias Ed Feldman, alias Axel C. Johnson, alias George Feldman, alias 'Roberts,' alias Alfred Feldman; Ben B. Laska; James C. Mathers, Defendants.

"INDICTMENT.

"At the January 1934 Term of the District Court of the United States for the Western District of Oklahoma, begun and held at the city of Oklahoma City, in said District, on the 1st day of January, in the year of our Lord one thousand nine hundred thirty-four, the Grand jurors of the United States of America, within and for said District, having been duly summoned, impaneled, sworn, and charged to inquire into and true presentment make of all public offenses against the laws of the United States of America, committed within said Dis-

trict in said State of Oklahoma, upon their oaths aforesaid, in the name and by the authority of the United States of America, do find and present:

"That heretofore, to-wit: On or about the 22nd day of July, in the year of our Lord 1933, and thence continuously thereafter until the return of this indictment, in the city of Oklahoma City, within the State of Oklahoma and within the Western District of Oklahoma, at Paradise, Texas, at Denver, Colorado, at Cheyenne, Wyoming, at Medford, Oregon, at Roseburg, Oregon, at Woodland, Washington, at Dunsmuir, California, and at divers other places to the Grand Jurors unknown and hence not herein stated, Albert L. Bates, alias George Bates, alias George C. King, alias George Davis, alias Ray Harris, alias Bernard McLaughlin, alias Bernard Hughes, and George R. Kelly, alias George Kelly, Kathryn Thorne Kelly, alias Catherine Kelly, Harvey J. Bailey, alias J. J. Brennan, alias John Brown, alias R. G. McDonal, Robert G. Shannon, Armon Crawford Shannon, and Ora L. Shannon, and the defendants, Alvin H. Scott, Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth Johnson, alias Doris Roberts, alias Doris Mansfield, Edward George Feldman, alias Edward George Feldmann, alias Ed Feldman, alias Axel C. Johnson, alias George Feldman, alias 'Roberts,' alias Alfred Feldman, Ben B. Laska, and James C. Mathers, who are herein indicted, did knowingly, wilfully, unlawfully and feloniously combine, confederate, and agree together, and with each other, and with divers other persons whose names are to the Grand Jurors unknown and hence not herein stated, to commit, during the period of time from the 22nd of July, 1933, and continuously thereafter up to and including the date and return of this indictment, a certain offense against the United States of America, that is to say, violate the provisions of the Act of Congress approved June 22, 1932, which provides a penalty

for the transportation in interstate commerce of any kidnapped person held for ransom or reward;

"Contrary to the form of the statute in such case made and provided and against the peace, government and dignity of the United States of America;

"That it was a part of said conspiracy that said Albert L. Bates, alias George Bates, alias George C. King, alias George Davis, alias Ray Harris, alias Bernard McLaughlin, alias Bernard Hughes, and George R. Kelly, alias George Kelly, Kathryn Thorne Kelly, alias Catherine Kelly, Harvey J. Bailey, alias J. J. Brennan, alias John Brown, alias R. G. McDonal, Robert G. Shannon, Armon Crawford Shannon, and Ora L. Shannon, and the defendants, Alvin H. Scott, Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth Johnson, alias Doris Roberts, alias Doris Mansfield, Edward George Feldman, alias Edward George Feldmann, alias Ed Feldman, alias Axel C. Johnson, alias George Feldman, alias 'Roberts,' alias Alfred Feldman, Ben B. Laska, and James C. Mathers, who are herein indicted, would, on or about the 22nd day of July, 1933, at the home of Charles F. Urschel, in Oklahoma City, Oklahoma, seize, kidnap and abduct the said Charles F. Urschel hereinafter referred to as victim;

"That it was further a part of said conspiracy that after having unlawfully seized and confined the said Charles F. Urschel in the custody, at the time and place aforesaid, they the aforesaid Albert L. Bates, alias George Bates, alias George C. King, alias George Davis, alias Ray Harris, alias Bernard McLaughlin, alias Bernard Hughes, and George R. Kelly, alias George Kelly, Kathryn Thorne Kelly, alias Catherine Kelly, Harvey J. Bailey, alias J. J. Brennan, alias John Brown, alias R. G. McDonal, Robert G. Shannon, Armon Crawford Shannon, and Ora L. Shannon, and the defendants, Alvin Scott, Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth

Johnson, alias Doris Roberts, alias Doris Mansfield, Edward George Feldman, alias Edward George Feldmann, alias Ed Feldman, alias Axel C. Johnson, alias George Feldman, alias 'Roberts,' alias Alfred Feldman, Ben B. Laska, and James C. Mathers, who are herein indicted, thereafter would hold and demand for his safe release from their custody, ransom in the sum of Two Hundred Thousand Dollars ($200,000.00) in genuine used Federal Reserve Currency in the denomination of Twenty dollars;

"That it was a further part of said conspiracy that they, Albert L. Bates, alias George Bates, alias George C. King, alias George Davis, alias Ray Harris, alias Bernard McLaughlin, alias Bernard Hughes, and George R. Kelly, alias George Kelly, Kathryn Thorne Kelly, alias Catherine Kelly, Harvey J. Bailey, alias J. J. Brennan, alias John Brown, alias R. G. McDonal, Robert G. Shannon, Armon Crawford Shannon, and Ora L. Shannon, and the defendants, Alvin H. Scott, Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth Johnson, alias Doris Roberts, alias Doris Mansfield, Edward George Feldman, alias Edward George Feldmann, alias Ed Feldman, alias Axel C. Johnson, alias George Feldman, alias 'Roberts,' alias Alfred Feldman, Ben B. Laska, and James C. Mathers, in effecting the unlawful seizure and confinement of victim, as aforesaid, would have an automobile under their control at the time and place aforesaid, would seize victim unlawfully as aforesaid, would force victim into said automobile then and there under their control, as aforesaid, and thereafter would blindfold, conceal and confine said victim in said automobile;

"That it was a further part of said conspiracy that after so concealing and confining said victim in said automobile, as aforesaid, the said Albert L. Bates, alias George Bates, alias George C. King, alias George Davis, alias Ray Harris, alias Bernard McLaughlin, alias Bernard Hughes, and George R. Kelly, alias George Kelly,

Kathryn Thorne Kelly, alias Catherine Kelly, Harvey J. Bailey, alias J. J. Brennan, alias John Brown, alias R. G. McDonal, Robert G. Shannon, Armon Crawford Shannon, and Ora L. Shannon, and the defendants, Alvin H. Scott, Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth Johnson, alias Doris Roberts, alias Doris Mansfield, Edward George Feldman, alias Edward George Feldmann, alias Ed Feldman, alias Axel C. Johnson, alias George Feldman, alias 'Roberts,' alias Alfred Feldman, Ben B. Laska, and James C. Mathers, who are herein indicted, knowingly, wilfully, unlawfully and feloniously would abduct, carry away and transport victim in interstate commerce, to-wit: From the place of seizure aforesaid in the city of Oklahoma City, aforesaid, in the state and district aforesaid, by a route to be selected by them, the aforesaid Albert L. Bates, alias George Bates, alias George C. King, alias George Davis, alias Ray Haris, alias Bernard McLaughlin, alias Bernard Hughes, and George R. Kelly, alias George Kelly, Kathryn Thorne Kelly, alias Catherine Kelly, Harvey J. Bailey, alias J. J. Brennan, alias John Brown, alias R. G. McDonal, Robert G. Shannon, Armon Crawford Shannon, and Ora L. Shannon, and the defendants aforesaid, Alvin H. Scott, Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth Johnson, alias Doris Roberts, alias Doris Mansfield, Edward George Feldman, alias Edward George Feldmann, alias Ed Feldman, alias Axel C. Johnson, alias George Feldman, alias 'Roberts,' alias Alfred Feldman, Ben B. Laska, and James C. Mathers, who are herein indicted, (said route being unknown to the Grand Jurors) to and into the State of Texas and to a point in the State of Texas approximately five (5) miles from Paradise, Wise County, Texas, known as the Shannon Ranch, where they, the said Albert L. Bates, alias George Bates, alias George C. King, alias George Davis, alias Ray Harris, alias Bernard McLaughlin, alias Bernard Hughes, and

George R. Kelly, alias George Kelly, Kathryn Thorne Kelly, alias Catherine Kelly, Harvey J. Bailey, alias J. J. Brennan, alias John Brown, alias R. G. McDonal, Robert G. Shannon, Armon Crawford Shannon, and Ora L. Shannon, and the defendants aforesaid, Alvin H. Scott, Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth Johnson, alias Doris Roberts, alias Doris Mansfield, Edward George Feldman, alias Edward George Feldmann, alias Ed Feldman, alias Axel C. Johnson, alias George Feldman, alias 'Roberts,' alias Alfred Feldman, Ben B. Laska, and James C. Mathers, who are indicted herein, would have a safe retreat at which to further confine, blindfold, shackle, handcuff, and chain said victim and hold him for ransom;

"That it was a further part of said conspiracy that they, Albert L. Bates, alias George Bates, alias George C. King, alias George Davis, alias Ray Harris, alias Bernard McLaughlin, alias Bernard Hughes, and George R. Kelly, alias George Kelly, Kathryn Thorne Kelly, alias Catherine Kelly, Harvey J. Bailey, alias J. J. Brennan, alias John Brown, alias R. G. McDonal, Robert G. Shannon, Armon Crawford Shannon, and Ora L. Shannon, and the defendants aforesaid, Alvin H. Scott, Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth Johnson, alias Doris Roberts, alias Doris Mansfield, Edward George Feldman, alias Edward George Feldmann, alias Ed Feldman, alias Axel C. Johnson, alias George Feldman, alias 'Roberts,' alias Alfred Feldman, Ben B. Laska, and James C. Mathers, who are here indicted, immediately upon receipt of said ransom money, would proceed to Denver, Colorado, Cheyenne, Wyoming, Oklahoma City, Oklahoma, Medford, Oregon, Roseburg, Oregon, Woodland, Washington, Dunsmuir, California, and divers other points unknown to the Grand Jurors, far distant from the scene of kidnapping, place of confinement and place of ransom payment, for the purpose of

changing said ransom money for other moneys or securities in order to avoid detection, apprehension and arrest, through the means of marked money;

"That it was a further part of said conspiracy that they, Albert L. Bates, alias George Bates, alias George C. King, alias George Davis, alias Ray Harris, alias Bernard McLaughlin, alias Bernard Hughes, and George R. Kelly, alias George Kelly, Kathryn Thorne Kelly, alias Catherine Kelly, Harvey J. Bailey, alias J. J. Brennan, alias John Brown, alias R. G. McDonal, Robert G. Shannon, Armon Crawford Shannon, and Ora L. Shannon, and the defendants aforesaid, Alvin H. Scott, Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth Johnson, alias Doris Roberts, alias Doris Mansfield, Edward George Feldman, alias Edward George Feldmann, alias Ed Feldman, alias Axel C. Johnson, alias George Feldman, alias 'Roberts,' alias Alfred Feldman, Ben B. Laska, and James C. Mathers, who are herein indicted, after the unlawful seizure of victim had been effected by them, as aforesaid, would select, with the advice of victim, some suitable person to be contacted from time to time by them, Albert L. Bates, alias George Bates, alias George C. King, alias George Davis, alias Ray Harris, alias Bernard McLaughlin, alias Bernard Hughes, and George R. Kelly, alias George Kelly, Kathryn Thorne Kelly, alias Catherine Kelly, Harvey J. Bailey, alias J. J. Brennan, alias John Brown, alias R. G. McDonal, Robert G. Shannon, Armon Crawford Shannon, and Ora L. Shannon, and the defendants aforesaid, Alvin H. Scott, Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth Johnson, alias Doris Roberts, alias Doris Mansfield, Edward George Feldman, alias Edward George Feldmann, alias Ed Feldman, alias Axel C. Johnson, alias George Feldman, alias 'Roberts,' alias Alfred Feldman, Ben B. Laska, and James C. Mathers, who are herein indicted, who would contact in return and convey to friends and

relatives of victim such notes, letters, demands, threats, and communications as they, Albert L. Bates, alias George Gates, alias George C. King, alias George Davis, alias Ray Harris, alias Bernard McLaughlin, alias Bernard Hughes, and George R. Kelly, alias George Kelly, Kathryn Thorne Kelly, alias Catherine Kelly, Harvey J. Bailey, alias J. J. Brennan, alias John Brown, alias R. G. McDonal, Robert G. Shannon, Armon Crawford Shannon, and the defendants aforesaid, Alvin H. Scott, Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth Johnson, alias Doris Roberts, alias Doris Mansfield, Edward George Feldman, alias Edward George Feldmann, alias Ed Feldman, alias Axel C. Johnson, alias George Feldman, alias 'Roberts,' alias Alfred Feldman, Ben B. Laska, and James C. Mathers, who are herein indicted, would deem necessary, containing information and instructions with regard to the place where, and the manner and amount in which the ransom monies for the release of said victim would be paid;

"That it was a further part of said conspiracy that they, Albert L. Bates, alias George Bates, alias George C. King, alias George Davis, alias Ray Harris, alias Bernard McLaughlin, alias Bernard Hughes, and George R. Kelly, alias George Kelly, Kathryn Thorne Kelly, alias Catherine Kelly, Harvey J. Bailey, alias J. J. Brennan, alias John Brown, alias R. G. McDonal, Robert G. Shannon, Armon Crawford Shannon, and Ora L. Shannon, and the defendants aforesaid, Alvin H. Scott, Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth Johnson, alias Doris Roberts, alias Doris Mansfield, Edward George Feldman, alias Edward George Feldmann, alias Ed Feldman, alias Axel C. Johnson, alias George Feldman, alias 'Roberts,' alias Alfred Feldman, Ben B. Laska, and James C. Mathers, who are herein indicted, would not release said victim from confinement in their custody until such time as the ransom moneys to be demanded

by them, as aforesaid, actually had been paid to them by friends and relatives of victim, acting through the contact man to be selected by them, as aforesaid;

And the Grand Jurors aforesaid, upon their oaths aforesaid, do further charge and present that at the hereinafter stated times, in pursuance of, in furtherance of, in execution of, and for the purpose of carrying out, and to effect the object, design and purpose of said conspiracy, the hereinafter named persons and defendants, who are herein indicted, did, knowingly, wilfully, unlawfully and feloniously, at the several times and places hereinafter mentioned in connection with their names, the several overt acts hereinafter specified:

## "OVERT ACTS

"1. That on the 22nd day of July, 1933, at about 11:15 P.M. the said Albert L. Bates, alias George Bates, alias George C. King, alias George Davis, alias Ray Harris, alias Bernard McLaughlin, alias Bernard Hughes, and George R. Kelly, alias George Kelly, went to the home of Charles F. Urschel at 327 Northwest Eighteenth Street, Oklahoma City, Oklahoma, and within the jurisdiction of this Court, and by force of arms unlawfully seized, kidnapped and abducted the said Charles F. Urschel and forced him to accompany them.

"2. That on or about the 22nd day of July, 1933, the said Albert L. Bates, alias George Bates, alias George C. King, alias George Davis, alias Ray Harris, alias Bernard McLaughlin, alias Bernard Hughes, and George R. Kelly, alias George Kelly, after having abducted and kidnapped the said Charles F. Urschel at Oklahoma City, Oklahoma, knowingly, wilfully and unlawfully transported him in interstate commerce by means of two or more automobiles, the exact make and model being to the Grand Jurors unknown, from Oklahoma City, Oklahoma, to a point about five miles from Paradise, Wise County, State of Texas, to the ranch and residence of one R. G. Shannon.

"3. That on or about the 23rd day of July, 1933, at the residence of said R. G. Shannon about five miles from Paradise, County of Wise, State of Texas, the said Albert L. Bates, alias George Bates, alias George C. King, alias George Davis, alias Ray Harris, alias Bernard McLaughlin, alias Bernard Hughes, and George R. Kelly, alias George Kelly, R. G. Shannon and Ora L. Shannon, blindfolded, shackled and concealed the said Charles F. Urschel. .

"4. That on or about the 24th day of July, 1933, said Albert L. Bates, alias George Bates, alias George C. King, alias George Davis, alias Ray Harris, alias Bernard McLaughlin, alias Bernard Hughes, and George R. Kelly, alias George Kelly, transported the said Charles F. Urschel in an automobile, the exact make and model being to the Grand Jurors unknown, a distance of approximately two miles from the residence of the said R. G. Shannon, to the residence of Armon Crawford Shannon, County of Wise, State of Texas.

"5. That from the 24th day of July, 1933, up to and including the 31st day of July, 1933, the said Albert L. Bates, alias George Bates, alias George C. King, alias George Davis, alias Ray Harris, alias Bernard McLaughlin, alias Bernard Hughes, George R. Kelly, alias George Kelly, R. G. Shannon, Armon Crawford Shannon, Ora L. Shannon and Harvey J. Bailey, alias J. J. Brennan, alias John Brown, alias R. G. McDonal, at the residence of Armon Crawford Shannon, county of Wise, State of Texas, chained, concealed, shackled and handcuffed the said Charles F. Urschel, pending the demand and receipt of the ransom payment of Two Hundred Thousand Dollars ($200,000.00).

"6. That on or about the 25th day of July, 1933, the said Albert L. Bates, alias George Bates, alias George C. King, alias George Davis, alias Ray Harris, alias Bernard McLaughlin, alias Bernard Hughes, and George R. Kelly, alias George Kelly, in Wise County, State of Texas, forced and caused the said Charles F. Urschel to

write at their dictation a certain letter addressed to one John J. Cattlett, Tulsa, Oklahoma, concerning directions and plans for negotiations with the said Albert L. Bates, alias George Bates, alias George C. King, alias George Davis, alias Ray Harris, alias Bernard McLaughlin, alias Bernard Hughes, and George R. Kelly, alias George Kelly, Kathryn Thorne Kelly, alias Catherine Kelly, Harvey J. Bailey, alias J. J. Brennan, alias John Brown, alias R. G. McDonal, Robert G. Shannon, Armon Crawford Shannon, and Ora L. Shannon, and the defendants aforesaid, Alvin H. Scott, Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth Johnson, alias Doris Roberts alias Doris Mansfield, Edward George Feldman, alias Edward George Feldmann, alias Ed Feldman, alias Axel C. Johnson, alias George Feldman, alias 'Roberts,' alias Alfred Feldman, Ben B. Laska, and James C. Mathers, who are herein indicted.

"7. That on or about the 26th day of July, 1933, the said Albert L. Bates, alias George Bates, alias George C. King, alias George Davis, alias Ray Harris, alias Bernard McLaughlin, alias Bernard Hughes, and George R. Kelly, alias George Kelly, caused to be delivered by Western Union messenger, at Tulsa, Oklahoma, to one John G. Cattlett, a letter from the said Charles F. Urschel and a letter from the said Albert L. Bates, alias George Bates, alias George C. King, alias George Davis, alias Ray Harris, alias Bernard McLaughlin, alias Bernard Hughes, and George R. Kelly, alias George Kelly, demanding the payment of Two Hundred Thousand Dollars ($200,000.00) for the release of said Charles F. Urschel and directions concerning certain steps to be taken in connection with carrying on negotiations with the said Albert L. Bates, alias George Bates, alias George C. King, alias George Davis, alias Ray Harris, alias Bernard McLaughlin, alias Bernard Hughes, and George R. Kelly, alias George Kelly, Kathryn Thorne Kelly, alias Catherine Kelly, Harvey J. Bailey, alias J.

J. Brennan, alias John Brown, alias R. G. McDonal, Robert G. Shannon, Armon Crawford Shannon, and Ora L. Shannon, and the defendants aforesaid, Alvin H. Scott, Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth Johnson, alias Doris Roberts, alias Doris Mansfield, Edward George Feldman, alias Edward George Feldmann, alias Ed Feldman, alias Axel C. Johnson, alias George Feldman, alias 'Roberts,' alias Alfred Feldman, Ben B. Laska, and James C. Mathers, who are herein indicted.

"8. That on or about July 27, 1933, Albert L. Bates, alias George Bates, alias George C. King, alias George Davis, alias Ray Harris, alias Bernard McLaughlin, alias Bernard Hughes, George R. Kelly, alias George Kelly, Kathryn Thorne Kelly, alias Catherine Kelly, and Harvey J. Bailey, alias J. J. Brennan, alias John Brown, alias R. G. McDonal, mailed and caused to be deposited in the United States mail at Joplin, Missouri, one certain letter further directing payment of Two Hundred Thousand Dollars ($200,000.00) ransom money for the release of Charles F. Urschel and directing the means and manner in which said payment was to be made, said letter being directed to E. E. Kirkpatrick and contained in an envelope addressed to Box H-807, Daily Oklahoman, Oklahoma City, Oklahoma.

"9. That on or about July 30, 1933, at Kansas City, Missouri, E. E. Kirkpatrick in accordance with the instructions theretofore given by Albert L. Bates, alias George Bates, alias George C. King, alias George Davis, alias Ray Harris, alias Bernard McLaughlin, alias Bernard Hughes, George R. Kelly, alias George Kelly, Kathryn Thorne Kelly, alias Catherine Kelly and Harvey J. Bailey, alias J. J. Brennan, alias John Brown, alias R. G. McDonal, delivered the sum of Two Hundred Thousand Dollars ($200,000.00) good and lawful money of the United States to one of the conspirators whose name is to the Grand Jurors unknown.

"10. That on or about August 7, 1933, at Madison,

Wisconsin, Kathryn Thorne Kelly, alias Catherine Kelly, transmitted and caused to be transmitted to R. G. Shannon at Paradise, Wise County, Texas the sum of Fifteen Hundred Dollars ($1,500.00), the exact form and manner of said transmittal being to the Grand Jurors unknown.

"11. That on or about August 12, 1933, at the residence of R. G. Shannon, County Wise, State of Texas, the said Harvey J. Bailey, alias J. J. Brennan, alias John Brown, alias R. G. McDonal, possessed and concealed approximately Seven Hundred Dollars ($700.00) of the original ransom money paid to the said conspirators for the release of the said Charles F. Urschel.

"12. That on or about August 13, 1933, at Denver, Colorado, the aforesaid Albert L. Bates, alias George Bates, alias George C. King, alias George Davis, alias Ray Harris, alias Bernard McLaughlin, alias Bernard Hughes, did knowingly, wilfully, unlawfully and feloniously possess and conceal approximately Ninety Thousand Dollars ($90,000.00), the exact amount thereof being to the Grand Jurors unknown, of the original ransom money paid to the said conspirators for the release of the said Charles F. Urschel.

"13. That on or about the 13th day of August, 1933, at Denver, Colorado, the aforesaid Albert L. Bates, alias George Bates, alias George C. King, alias George Davis, alias Ray Harris, alias Bernard McLaughlin, alias Bernard Hughes, although then under arrest and imprisoned at Denver, Colorado, sent a message to the defendant Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth Johnson, alias Doris Robert, alias Doris Mansfield, in which he advised her concerning the location and place of concealment of approximately Ninety Thousand Dollars ($90,000.00), the exact amount thereof being to the Grand Jurors unknown, of the original ransom money paid to the said conspirators for the release of the said Charles F. Urschel, so possessed and concealed by him,

as alleged under Overt Act No. 12 hereof, and advised her to take possession thereof and leave Denver, Colorado, therewith.

"14. That on or about the 13th day of August, 1933, at Denver, Colorado, the defendant, Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth Johnson, alias Doris Roberts, alias Doris Mansfield, acting under the information and advice of the said Albert L. Bates, alias George Bates, alias George C. King, alias George Davis, alias Ray Harris, alias Bernard McLaughlin, alias Bernard Hughes, did knowingly, wilfully, unlawfully, and feloniously, take possession of approximately Ninety Thousand Dollars ($90,000.00), the exact amount thereof being to the Grand Jurors unknown, of the original ransom money paid to the said conspirators for the release of the said Charles F. Urschel, and remove the same from Denver, Colorado.

"15. That on or about the 15th day of August, 1933, at a place about ten (10) miles east of Laramie, Wyoming, the defendants Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth Johnson, alias Doris Roberts, alias Doris Mansfield, and Edward George Feldman, alias Edward George Feldmann, alias Ed Feldman, alias Axel C. Johnson, alias George Feldman, alias 'Roberts,' alias Alfred Feldman, did then and there knowingly, wilfully, unlawfully and feloniously, possess approximately Ninety Thousand Dollars ($90,000.00) of the original ransom money paid to the said conspirators for the release of the said Charles F. Urschel, and they, the said defendants, Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth Johnson, alias Doris Roberts, alias Doris Mansfield, and Edward George Feldman, alias Edward George Feldman, alias Ed Feldman, alias Axel C. Johnson, alias George Feldman, alias 'Roberts,' alias Alfred Feldman, being so possessed of said original ransom money, did then and

there knowingly, wilfully, unlawfully and feloniously bury and conceal approximately Seventy-five Thousand Dollars ($75,000.00) thereof, the exact amount being to the Grand Jurors unknown.

"16. That on or about August 1, 1934, the defendants Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth Johnson, alias Doris Roberts, alias Doris Mansfield, and Alvin H. Scott, removed approximately Seventy-five Thousand Dollars ($75,000.00), the exact amount thereof being to the Grand Jurors unknown, of the original ransom money paid to the said conspirators for the release of the said Charles F. Urschel, knowing the same to be a part of the original ransom money paid to the said conspirators for the release of the said Charles F. Urschel, from the place where the same had previously been buried and concealed by the defendants, Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth Johnson, alias Doris Roberts, alias Doris Mansfield, and Edward George Feldman, alias Edward George Feldmann, alias Ed Feldman, alias Axel C. Johnson, alias George Feldman, alias 'Roberts,' alias Alfred Feldman, ten (10) miles east of Laramie, Wyoming, and did immediately thereafter, knowingly, wilfully, unlawfully, and feloniously conceal and transport the same to various places in the states of Oregon and Washington, the exact places being to the Grand Jurors unknown.

"17. That on or about November 2, 1934, at Roseburg, Oregon, the said defendant, Alvin H. Scott, did knowingly, wilfully, unlawfully and feloniously possess, transport and conceal approximately One Thousand Three Hundred Sixty Dollars ($1,360.00), the exact amount thereof being to the Grand Jurors unknown, of the original ransom money paid to the said conspirators for the release of the said Charles F. Urschel.

"18. That on or about August 15, 1934, the said defendants, Clara Davis, alias Clara Feldman, alias Clara

Feldmann, alias Mrs. George L. Davis, alias Miss Ruth Johnson, alias Doris Roberts, alias Doris Mansfield, and Alvin H. Scott, did then and there knowingly, wilfully, unlawfully and feloniously, possess, bury and conceal on premises known as Route No. 1, Box 107, occupied by Margaret Hurtienne and the defendant Alvin H. Scott, at Medford, Oregon, approximately One Thousand Four Hundred Sixty Dollars ($1,460.00), the exact amount thereof being to the Grand Jurors unknown, of the original ransom money paid to the said conspirators for the release of the said Charlies F. Urschel, which said money they, the said defendants Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth Johnson, alias Doris Roberts, alias Doris Mansfield, and Alvin H. Scott, then and there well knew was a portion of the original ransom money previously removed by the defendant, Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth Johnson, alias Doris Roberts, alias Doris Mansfield, on or about August 13, 1933, from Denver, Colorado, as alleged under Overt Act No. 14 hereof.

"19. That on or about August 15, 1934, the said defendant, Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth Johnson, alias Doris Roberts, alias Doris Mansfield, did knowingly, wilfully, unlawfully and feloniously, possess, bury and conceal on premises known as Route No. 1, Box 107, occupied by Margaret Hurtienne and the defendant, Alvin H. Scott, at Medford, Oregon, approximately Four Thousand Six Hundred Eighty Dollars ($4,680.00), the exact amount thereof being to the Grand Jurors unknown, of the original ransom money paid to the said conspirators for the release of the said Charles F. Urschel, which said money was, as the said defendant, Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth Johnson, alias Doris Roberts, alias Doris Mansfield,

then and there well knew, part of the original ransom money previously removed by her, the said Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George Davis, alias Miss Ruth Johnson, alias Doris Roberts, alias Doris Mansfield, and the defendant Alvin H. Scott, from a place where the same had been buried and concealed on or about August 15, 1933, by said defendants Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth Johnson, alias Doris Roberts, alias Doris Mansfield, and Edward George Feldman, alias Edward George Feldmann, alias Ed Feldman, alias Axel C. Johnson, alias George Feldman, alias 'Roberts,' alias Alfred Feldman, approximately ten (10) miles east of Laramie, Wyoming, and which said money, as she, the said defendant, Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth Johnson, alias Doris Roberts, alias Doris Mansfield, well knew was part of the original ransom money previously removed by her on or about August 13, 1933, from Denver, Colorado, as alleged under Overt Act No. 14 hereof.

"20. That on or about November 9, 1934, at Dunsmuir, California, the defendants Edward George Feldman, alias Edward George Feldmann, alias Ed Feldman, alias Axel C. Johnson, alias George Feldman, alias 'Roberts,' alias Alfred Feldman, and Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth Johnson, alias Doris Roberts, alias Doris Mansfield, did then and there knowingly, wilfully, unlawfully and feloniously possess and conceal approximately One Thousand One Hundred Dollars ($1,100.00), the exact amount being to the Grand Jurors unknown, of the original ransom money paid to the said conspirators for the release of the said Charles F. Urschel, the same being a portion of the original ransom money removed from Denver, Colorado, by the defendant Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth

Johnson, alias Doris Roberts, alias Doris Mansfield, on or about August 13, 1933, as alleged under Overt Act No. 14 hereof.

"21. That on or about August 15, 1934, the defendant Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth Johnson, alias Doris Roberts, alias Doris Mansfield, did then and there knowingly, wilfully, unlawfully and feloniously possess, bury and conceal, and cause to be buried and concealed, approximately Twenty-eight Thousand Four Hundred Dollars ($28,400.00), the exact amount thereof being to the Grand Jurors unknown, of the original ransom money paid to the conspirators for the release of the said Charles F. Urschel, at a place on Green Mountain, approximately six (6) miles northeast of Woodland, Washington, said money, being, as the said defendant Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth Johnson, alias Doris Roberts, alias Doris Mansfield, then and there well knew, a portion of the original ransom money which had been previously removed from Denver, Colorado, on or about August 13, 1933, by her, the said Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth Johnson, alias Doris Roberts, alias Doris Mansfield, as alleged under Overt Act No. 14 hereof.

"22. That on or about April 1, 1934, the defendant, Edward George Feldman, alias Edward George Feldmann, alias Ed Feldman, alias Axel C. Johnson, alias George Feldman, alias 'Roberts,' alias Alfred Feldman, at a place on Green Mountain, approximately six (6) miles northeast of Woodland, Washington, did knowingly, wilfully, unlawfully and feloniously possess, bury and conceal approximately One Thousand Five Hundred Twenty Dollars ($1,520.00), of the original ransom money paid to the conspirators for the release of the said Charles F. Urschel, which said money he, the said defendant Edward George Feldman, alias Edward

George Feldmann, alias Ed Feldman, alias Axel C. Johnson, alias George Feldman, alias 'Roberts,' alias Alfred Feldman, then and there well knew was a portion of the original ransom money which had previously, on or about August 13, 1933, been removed by the defendant Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth Johnson, alias Doris Roberts, alias Doris Mansfield, from Denver, Colorado, as alleged under Overt Act No. 14 hereof.

"23. That on or about September 15, 1934, the defendant Alvin H. Scott did, at a place on Green Mountain approximately six (6) miles northeast of Woodland, Washington, knowingly, wilfully, unlawfully and feloniously possess, bury and conceal approximately Five Thousand Six Hundred Twenty Dollars ($5,620.00), the exact amount thereof being unknown to the Grand Jurors, of the original ransom money paid to the said conspirators for the release of the said Charles F. Urschel, which said money he, the said Alvin H. Scott, then and there well knew to be a portion of the original ransom money removed on or about August 13, 1933, from Denver, Colorado, by the defendant Clara Davis, alias Clara Feldman, alias Clara Feldmann, alias Mrs. George L. Davis, alias Miss Ruth Johnson, alias Doris Roberts, alias Doris Mansfield, as alleged under Overt Act No. 14 hereof.

"24. That on or about August 16, 1933, the said defendant Edward George Feldman, alias Edward George Feldmann, alias Ed Feldman, alias Axel C. Johnson, alias George Feldman, alias 'Roberts,' alias Alfred Feldman, did, at the request of the said defendant Ben B. Laska, meet the said defendant Ben B. Laska at Denver, Colorado, and did, then and there, knowingly, wilfully, unlawfully and feloniously, possess, conceal and pay over to the said defendant Ben B. Laska approximately Eight Thousand Dollars ($8,000.00), the exact amount thereof being to the Grand Jurors unknown, of the

original ransom money paid to the said conspirators for the release of the said Charles F. Urschel.

"25. That on or about August 16, 1933, at Denver, Colorado, the said defendant, Ben B. Laska, did, then and there, knowingly, wilfully, unlawfully and feloniously, accept and receive from the said defendant Edward George Feldman, alias Edward George Feldmann, alias Ed Feldman, alias Axel C. Johnson, alias George Feldman, alias 'Roberts,' alias Alfred Feldman, approximately Eight Thousand Dollars ($8,000.00), the exact amount thereof being to the Grand Jurors unknown, of the original ransom money paid to the said conspirators for the release of the said Charles F. Urschel, and he, the said defendant Ben B. Laska, did then and there knowingly, wilfully, unlawfully and feloniously, possess and conceal the same, knowing said money to be a portion of the original ransom money paid to said conspirators for the release of the said Charles F. Urschel.

"26. That on or about September 16, 1933, at Oklahoma City, Oklahoma, the said defendant Edward George Feldman, alias Edward George Feldmann, alias Ed Feldman, alias Axel C. Johnson, alias George Feldman, alias 'Roberts,' alias Alfred Feldman, did then and there knowingly, wilfully, unlawfully and feloniously possess, conceal and pay over to the said defendant Ben B. Laska, approximately Two Thousand Dollars ($2,000.00), the exact amount thereof being to the Grand Jurors unknown, of the original ransom money paid to the said conspirators for the release of the said Charles F. Urschel.

"27. That on or about September 16, 1933, at Oklahoma City, Oklahoma, the said defendant Ben B. Laska did then and there knowingly, wilfully, unlawfully and feloniously, accept and receive from the defendant Edward George Feldman, alias Edward George Feldmann, alias Ed Feldman, alias Axel C. Johnson, alias George Feldman, alias 'Roberts,' alias Alfred Feldman, approximately Two Thousand Dollars ($2,000.00), the exact

amount thereof being to the Grand Jurors unknown, the same being a portion of the original ransom money paid to the said conspirators for the release of the said Charles F. Urschel, and he, the said defendant Ben B. Laska, did then and there knowingly, wilfully, unlawfully and feloniously, possess and conceal the same knowing said money to be a portion of the original ransom money paid to the said conspirators for the release of the said Charles F. Urschel.

"28. That on or about September 16, 1933, at Oklahoma City, Oklahoma, the said defendant Ben B. Laska, did then and there knowingly, wilfully, unlawfully and feloniously, possess, conceal and pay over to, or cause to be paid over to, the said defendant James C. Mathers approximately One Thousand Dollars ($1,000.00) the exact amount thereof being to the Grand Jurors unknown, of the original ransom money paid to said conspirators for the release of the said Charles F. Urschel.

"29. That on or about September 16, 1933, at Oklahoma City, Oklahoma, the said defendant James C. Mathers, did then and there knowingly, wilfully, unlawfully and feloniously, accept and receive from the said defendants Ben B. Laska and Edward George Feldman, alias Edward George Feldmann, alias Ed Feldman, alias Axel C. Johnson, alias George Feldman, alias 'Roberts,' alias Alfred Feldman, approximately One Thousand Dollars ($1,000.00), the exact amount thereof being to the Grand Jurors unknown, of the original ransom money paid to said conspirators for the release of the said Charles F. Urschel, and he, the said defendant James C. Mathers, did then and there knowingly, wilfully, unlawfully and feloniously, possess and conceal the same, knowing said money to be a portion of the original ransom money paid to said conspirators for the release of the said Charles F. Urschel;

"Contrary to the form of the statute in such case made and provided and against the peace, government and dignity of the United States of America.

"Francis M. Dudley, Assistant United States Attorney."

Respondent and Mathers, the Oklahoma lawyer, pleaded not guilty. On his motion, Mathers, the local attorney, was acquitted by direction of the court, while respondent, whose like motion was denied, was found guilty and sentenced as alleged in the disbarment charge. It is pertinent to observe here that notwithstanding the sweeping allegations of the indictment to the effect that respondent was in the kidnaping conspiracy from the beginning, the government announced at the opening of the trial it had no such evidence and offered none. At the trial Ed Feldmann, who some months before had pleaded guilty, as we have seen, testified that some time after August 15, 1933, at night, and when only he and respondent were present, he had given respondent $10,000 of the ransom money as a fee for services and expenses in the matter of his stepfather's defense, and that respondent knew the character of the money at the time of his receipt thereof. Respondent denied the whole story. Clara Feldmann, who also had pleaded guilty long before the time of the trial, testified that in November, 1933, some two months after her husband's conviction, she called on respondent and expressed her desire to surrender to the authorities and disgorge the ransom funds, but because of respondent's advice otherwise she took no such step. She further testified that respondent advised her how to bury or otherwise conceal the money. Respondent denied that conversation of any such import had ever occurred, and testified that not until the Feldmanns were arrested and full development of their part in the matter had been disclosed, did he know they were possessed of the ransom money. Ed Feldmann testified further that at the time of the trial of Bates he went to Oklahoma City, where the trial was proceeding, and placed $2,000 of the ransom money under a rug in the bathroom in respondent's hotel quarters as a fee for respondent and Mathers.

He testified that both lawyers were present, but that only respondent went in the bathroom with him at the time the money was left as indicated. Respondent denied the whole story, and Mathers, disclaiming knowledge of any such proceeding, denied that he had been in respondent's room at any time when Feldmann was there. Respondent denied having received any money from Feldmann other than the three thousand dollars paid him as already related, and it is not claimed that that money was of the ransom funds.

It was in connection with the testimony of the self-confessed Feldmanns and the right of respondent's counsel at the trial to comment thereon, that the trial judge voluntarily made such rulings and prejudicial comment that, as I think, fair consideration at the hands of the jury was rendered impossible. Bearing in mind that only the Feldmanns bore testimony involving respondent, the right of comment to the jury as to their activities throughout, their pleas of guilt, the long deferred imposition of sentence on the pleas, their "reason to expect immunity if they assisted in the conviction of Laska," was of the utmost importance. Counsel for respondent was proceeding so, when the court stopped him, saying: "I do not know whether this is proper argument or not. The proposition of sentence is with the court, and it is not with the District Attorney's office, as to when these people will be sentenced. The reason they have not been sentenced, I didn't think it necessary, but the law under which they were indicted was being tested. It had not yet been decided by the Circuit Court of Appeals. The Government felt, and this court felt it would be better to wait until the Circuit Court of Appeals had passed on it, and the Supreme Court had passed upon that, and a final decision was rendered only a few weeks ago. That is the reason they have not been sentenced. I prefer you not discuss the matter further." An exception was reserved and the point was emphasized on review in the Court of Ap-

peals. That court had jurisdiction to say the ruling was not prejudicial, as it did, but by all the books, and in the conception of every lover of justice, as I venture to state, the conduct of the trial judge was unfair. The vice of the ruling is twofold. First, counsel should not have been interrupted in his comment. The sole witnesses against Laska were confessed criminals. They had entered formal pleas to the effect that they were involved in the conspiracy from the inception of the crime, and stood unsentenced for months. In such situation counsel was well within the rule as he sought to argue to the jury the implications of the delayed sentence, and what consideration the Feldmanns were likely to enjoy because of their testimony against Laska. The presiding judge, on his own motion let it be noted, not on objection of government counsel, silenced argument that the jury was entitled to hear, and which in the interest of fairness should have been permitted. Second, and assuming for the moment that to deny counsel the right to argue the point could be justified, the trial judge did not stop with that ruling. He proceeded to present to the jury facts not in evidence, to the effect that there was a legitimate reason for postponing pronouncement of sentence on the Feldmanns, from which the jury may well have inferred that the latter were not to enjoy any sort of immunity because of their testimony against Laska, and therefore improper incentive did not prompt their story. In short, that the Feldmanns, to then unwhipped of justice, were to enjoy no favor at the hands of the court. That was the situation at the conclusion of the argument to the jury. In his instructions the judge returned to the subject, saying "* * * the witness Edward Feldmann is a defendant in this case. He has entered his plea of guilty. He has testified at the request of the government. There is no evidence or indication that any promise of any character has been made by any representative of the government, and certainly there is no indication that the

court has or would give him any different sentence in this case than that which would be given had he not testified." There was similar expression by the judge relative to Clara Feldmann. Thus, the situation fairly stated, it appears, first, that comment by counsel calculated to excite legitimate thought on the part of the jurors as to the credibility of the Feldmanns, excluded in a ruling inherently erroneous, as I think, was made sterile by the comment of the judge on the identical issue he would not permit counsel to discuss. The finality of his remarks in ruling on his own objection to counsel's attempt to make comment, operated to preclude any consideration by the jury of the possibility that the Feldmanns, finally cornered by the law and facing overwhelming evidence of their own guilt, might be testifying against Laska in the hope of favorable judgment in their own case. Second, and as if to make certain that which already bore his imprimatur, the judge re-emphasized the "nonsense" of the thought that anybody connected with the government and interested in prosecuting Laska, would "deal" with the Feldmanns; and, as if doubting whether the jurors would have faith in any other than himself, even after he had given the prosecution a certificate of character, the judge assured the triers of the facts they could depend on him to make manifest at the appropriate time that the Feldmanns were not expecting any favors.

The sequel: On the very day that a verdict of guilty was returned against Laska, and almost within the hour, the same judge, calling the Feldmanns, as well as brother-in-law Scott, before him, did not sentence them to life imprisonment as had been his visitation on others in like situation in relation to the same offense — and in those instances he had not waited for the law to be tested — or to any other considerable term of imprisonment, but he let these confessing major miscreants off with a sentence of five years; and having thus appraised the enormity of their crime, the judge proceeded at

once to nullify even that sentence by ordering parole, effective immediately, for the full period of the sentence. Honorable Ralph L. Carr, former United States district attorney, and now governor of Colorado, and who was chief counsel for Laska in the Court of Appeals, noted this very significant situation, and fittingly commented of the Feldmanns that in the course of the trial, "They had played their part." Yes, the Feldmanns had played *their* part! And the play was not staged by them alone, nor were the other actors less faithful to the script. There was not a breakdown in the entire cast, and the dramatic unity and interest held fast until respondent was convicted, and the Feldmanns, as no reasonable man can fail to believe, had received the reward of their thespian labors.

It should be borne in mind that respondent's situation was difficult in any event. The setting of his trial was in the home city of the kidnaped man, who, with his wife, attended the trial. The two elderly Shannons, being of those who helped guard the victim pending payment of the ransom, and who were sentenced to life imprisonment in the same court by the same judge, were brought to the court room from the penitentiary. There was "unusual interest shown by the public in this case," as the judge himself remarked, and the feeling of the outraged community necessarily was tense. The circumstances should have moved the judge to great care. Instead, as the record makes clear, he not only did not exercise care, but in instances took over the functions of the prosecutor. That the incident already related comes within that category, cannot be gainsaid. Another instance had to do with the witness Duran, a Denver resident, and related to Clara Feldmann in manner already detailed. The uncontradicted evidence is that when Bates concluded he was being held on the kidnaping charge, he engaged respondent to represent him, and agreed to pay him a fee. He told respondent where to find Duran and to get in touch with him. Respondent,

proceeding as Bates directed, contacted Duran, who promptly "found" Ed Feldmann and showed him to respondent's office. Bearing in mind that Bates, not Laska, knew Duran and his address, and that Bates trusted Duran to find his stepson, should any be so naive as to believe Duran was ignorant of the real situation? As I have indicated in another connection, there was no evidence that Bates informed Laska of the whereabouts of members of his family, or that Laska ever knew where they were. In other words, by the employment of Duran, for sufficient reason enjoying his confidence, Bates, still making no disclosure as to the residence of his family, accomplished his purpose to have his stepson call on Laska. The secrecy in that regard was observed as well by Ed Feldmann when he called at Laska's office, his statement being that he "came from out of town and he was going back." But note how the judge instructed the jury in regard to Duran. "The witness Duran," said the judge, "is not a defendant in this case. He is not connected with any of the defendants in any way, except that his sister married a brother of Clara Feldmann, but he was requested by the defendant Laska to tell Edward Feldmann or his mother, if he saw them, that the defendant Laska desired to see them and for them to get in touch with the defendant Laska." Why did the judge wish to temper the situation for Duran by minimizing his relationship to Clara Feldmann? Why did he emphasize that Duran was "not connected with any of the defendants in any way, except * * * Laska?" Why, assuming the right of the judge to call attention to salient features of the testimony of the witness, or the implications attending his relationship to any of the parties, did he not discuss it fully? For instance, why did he not mention Bates' part in introducing Duran to the case? Why did he not say to the jury that Duran's acquaintance with Bates, the latter's evident confidence in Duran, the alacrity and ease with which Duran sought out and found Ed Feld-

mann and directed him to Laska's office, as Bates wished, as well as his familiarity with the members of the Bates family generally, also were factors to be considered by the jury in determining his credibility? The answer is that the judge, taking advantage of the "weight of his authority," was making an argument on the side of the prosecution, and, after the manner of advocates, he was intent on the side he favored. He seemingly forgot that "The government provides an officer to argue the case to the jury." For the judge to so engage was not of his duty. *Weare v. United States*, 1 F. (2) 617. Fair? Honorable John C. Vivian, lieutenant governor of Colorado, a lawyer of eminence and standing, and a member of one of Colorado's oldest and best respected families, testifying at the hearing conducted under our direction, said that the concensus among lawyers and newspaper men who had followed the case and were familiar with the record, was that the trial in the federal court "was very unfair as far as Laska was concerned." As for himself, Governor Vivian said: "The impression left on me was that Ben Laska was framed." While in my more limited vocabulary it is not likely I should have thought of the comprehensive term employed by Colorado's potential first citizen, I adopt it as expressive of my own conclusion.

Considering the all-inclusive dates of the indictment, the mass of detail of the activities of Clara Feldmann and Ed Feldmann — both of the Bates immediate household — in relation to the whole matter, and their plea of guilty thereto, who can doubt that they were in and of the conspiracy from the beginning, precisely as charged in the indictment. They got well away from Denver and the apartment where they and Bates had been living just before the kidnaping, and returned to that city and into a different apartment at the right time to have a place in which Bates could put the brown bag "away," a facility of which he made prompt avail. Let it not be forgotten that Bates was at his wife's apart-

ment, left the bag in the early morning of August 10, and took his departure almost immediately, never returning. He was not arrested until the 12th. Why did he remain away from his family in the interim? The answer is simple — he was not going to be trailed to, or found at, the place of concealment of the vast sum which was his share of the ransom. Otherwise expressed Bates, naturally fearful of apprehension, wishing to save his ill-gotten fortune, hopefully for the comfort of himself and those he loved, and for the latter in any event, and having successfully evaded the minions of the law to the point where the money had been turned over to his wife and stepson, carefully avoided being with them or near the money. Is it to be believed that the members of his family did not know what was going on? The answer is that as soon as they learned Bates was under arrest, the night of August 13, and which preceded the time they knew respondent, or even had heard of him, they fled, carrying the bag containing ransom money. Did they then know what was in the brown bag? Their own testimony discloses that they did. If innocent minded, as, in extremity, but not before, they effectively advanced in their own behalf, Why did they not then report to the authorities? Or, failing anything so heroic, Why did they take with them the bag containing the large sum already appearing — the evidence of the master crime? What of Duran, of kin to Mrs. Bates by affinity? Why did Bates suggest that respondent see Duran about a fee? Why did he not advise that he seek the Feldmanns direct? The answer is obvious. Bates was willing to pay respondent a fee of $3,000, but he was careful that not even his attorney should know where his wife and her son, the sole custodians of the cash fortune he had obtained through his crime, were to be found. What of Alvin H. Scott, another member of the family? Why did he accompany the Feldmanns to Denver, August 7, 1933? He, like Clara and Ed Feldmann, pleaded guilty

to the indictment. He, not less than the Feldmanns, as the record unmistakably indicates, knew about when and where Bates was to have the money, and leave it. The celerity with which he became interested in handling Bates' portion of the ransom money is worthy of remark. Indeed, it was the arrest of Scott in October, 1934, that pointed the way to the authorities in their effort to find the money and apprehend others of the conspiracy. Scott was diligent and successful in his service to the Bates family, as well as in his own enrichment, until he had an automobile accident of such character that he was held for investigation. On his person the arresting officers found something like $1,300 of the Urschel money. Through leads that the Scott arrest developed the authorities traced the Feldmanns, and November 9, 1934, their arrest was effected. They had some of the ransom money, Clara Feldmann about $1,000 and Ed Feldmann $800. As a further indication of the "family" control exercised by the Feldmanns, a control they enjoyed through the faith of Bates in their loyalty to him, much of the money was found buried on the ranch of Clara Feldmann's father, and more of it on the ranch of an uncle.

The charge against respondent in the federal court was based on acts allegedly committed by him in 1933. The only Act of Congress relative to kidnaping then in effect, passed in 1932, read as follows: "Whoever shall knowingly transport or cause to be transported, or aid or abet in transporting, in interstate or foreign commerce, any person who shall have been unlawfully seized, confined, inveigled, decoyed, kidnaped, abducted, or carried away by any means whatsoever and held for ransom or reward shall, upon conviction, be punished by imprisonment in the penitentiary for such term of years as the court, in its discretion, shall determine: *Provided,* that the term 'interstate or foreign commerce' shall include transportation from one state, territory, or the District of Columbia to another state, territory, or the

District of Columbia, or to a foreign country; or from a foreign country to any state, territory, or the District of Columbia: *Provided further,* that if two or more persons enter into an agreement, confederation, or conspiracy to violate the provisions of the foregoing act and do any overt act toward carrying out such unlawful agreement, confederation, or conspiracy such person or persons shall be punished in like manner as hereinbefore provided by this act." 47 Stat. at Large 326. Considering the concession of the government at the opening of the trial that respondent was not of the "original conspirators," although it formally so charged, and that since there was no evidence that he "transported," or did "aid or abet in transporting, in interstate or foreign commerce," or otherwise, or at all, the victim of the kidnapers, I come now to discuss what I regard as an unfair statement in the major opinion. March 27, 1935, the Attorney General of the United States, addressing the Committee on the Judiciary of the United States Senate, wrote as follows: "I enclose herewith a draft of a bill to amend the so-called 'Federal Kidnaping Act' so as to make it a crime to receive, possess, or dispose of the ransom money. The present law is inadequate to reach persons handling ransom money. The proposed amendment would make such persons accessories after the fact to a violation of the Kidnaping Act." In 1936 Congress passed the recommended bill, which reads: "Whoever receives, possesses or disposes of any money or other property, or any portion thereof, which has at any time been delivered as ransom or reward in connection with a violation of section 408a of this title [act of 1932], knowing the same to be money or property which has been at any time delivered as such ransom or reward, shall be punished by a fine of not more than $10,000 or imprisonment in the penitentiary for not more than ten years or both." 49 Stat. at Large 1099, p. 110, §408c, Cumulative Supplement, 1939, Title 18, U. S. C. A. Predicated so, respondent's counsel ventured

to urge in this proceeding that since the date of his alleged offense was some three years prior to the enactment which made it a crime, and otherwise, as the Attorney General of the United States stated, and the Congress recognized, was not a federal offense, they might fairly call our attention to the fact that his conviction in the federal court was without legal basis, hence unfair. The learning of lawyers would lead to the conclusion that the Attorney General's suggestion was sound, and that the Congress thought so is evidenced by the passage of the act which he recommended. Remembering that the charge here is that respondent was "convicted," not that he was guilty, the point urged is clearly pertinent. But note how the major opinion disposes of the suggestion. "On Laska's contention that the statute under which he was indicted was inapplicable two federal courts have found against him * * *. But the acts charged, if committed," says the opionion, "would here have the same result if no statute forbade them." Of course; but who has argued otherwise? Did Governor Carr, who, until his high public duties intervened to prevent, headed counsel for respondent here, contend so? No. Did Jean S. Breitenstein, Esq., also appearing for respondent, advance that thought? No. Did Philip Hornbein, Esq., of like counsel, do violence to the intelligence of himself and associate counsel, and insult ours, by presenting that view? No. Did other counsel, whose names appear on the title page of the opinion, urge that doctrine? No. Has respondent himself given voice to so ridiculous a claim? Never. His defense in this proceeding, put in form by Carr, Breitenstein and Hornbein, always and ever has been that he was not accorded a fair trial in the federal court; and moreover, was not guilty. The language of the court implies that respondent is contending that since there was no federal statute making the receipt of ransom (stolen) money a crime, such receipt would not operate to subject him to discipline at our hands. The implication is quite con-

trary to respondent's stated position. After setting forth the situation in relation to the federal statutes, and stating that in light thereof "the conviction was founded on an erroneous legal theory," not to be gainsaid if the Attorney General of the United States rightly advised, his counsel added: "Of course we do not mean to imply that an attorney who knowingly receives any kind of stolen property is not guilty of a crime. The crime that he is guilty of would be 'receiving stolen property' and he would be amenable solely to the jurisdiction of the state where the offense was committed, provided, of course, there is no federal statute making such an act a crime —which was the situation in the case at bar. Furthermore, to warrant the exercise of disciplinary jurisdiction, it is not necessary that the attorney brought before the bar of this Court should have actually committed a crime. It is sufficient if he had committed a gross moral dereliction, and we freely concede that if he knowingly received ransom money, or any form of stolen money, it would constitute such moral delinquency as to warrant the infliction of the highest penalty of disciplinary jurisdiction. But we are charged at this bar with the conviction pronounced by the Oklahoma Federal Court. *We are not defending on the theory that respondent may have committed some crime other than the crime charged, or may have been guilty of some gross delinquency not amounting to the crime charged. It is our position that the respondent is innocent; that he neither committed the crime charged, nor any other crime. Our contention merely goes against the record.* We maintain that this Honorable Court should not feel bound to accept it as importing absolute verity, in view of the plain fact that the judgment is based upon a legal theory that is manifestly unsound, as clearly demonstrated by the opinion of the Attorney General of the United States." As the court's comment is unjust, as I think, so I regard *People ex rel. v. Weeber,* 26 Colo. 229, 57 Pac. 1079, cited at that point in the court opinion, as without appli-

cation. The record in that case discloses that the respondent Weeber neither pleaded nor contended that he did not have a fair trial in the federal court; nor did he assert that he was not guilty of the charge of which he had been convicted. On the contrary, he stated he "had no disposition to defend" the act out of which his prosecution arose.

Briefly, I now review testimony given subsequent to the federal court trial. It comes from good and distinguished citizens, and should challenge attention in a matter where the judgment to be given is wholly within our keeping. The witnesses knew, and we know, the fact, the possibility of which the federal court jury was not permitted to consider, even as an argument, namely, that the Feldmanns, wickedly cognizant of the vile conspiracy from its inception, were given their freedom the day Laska was found guilty.

I already have considered and commented upon the testimony of Mr. Vivian. As to the other witnesses and their stories, the record discloses as follows: Governor Carr was not personally called to testify in this proceeding, but in another of our records properly to be noticed, his testimony pertinently appears. Mrs. Edison, an attorney, already mentioned, testified at the Oklahoma trial that she and Miss Ohle, also previously introduced, witnessed the payment of $3,000 to Laska in his office by young Feldmann. Mrs. Edison was promptly indicted in the same court for perjury. On the advice of eminent counsel, the while insisting she was innocent, Mrs. Edison entered a plea of nolo contendere on which she received a suspended sentence. Based thereon, her disbarment at our hands was sought. After trial under our direction we dismissed the proceeding. *People ex rel. v. Edison*, 100 Colo. 574, 69 P. (2d) 246. In the course of Mrs. Edison's trial on the disciplinary complaint, many prominent attorneys testified in her behalf, among whom was Mr. Carr, who said he represented Mrs. Edison in the matter of the indictment against her,

explaining that his familiarity with the Laska record "convinced me of the attitude of mind of every Oklahoman, and I felt that when Mr. Laska was convicted on evidence of the character which was received to convict him, that it would have been a very unwise thing to sacrifice this young woman to a jury in the same jurisdiction, and for that reason advised her to take the plea of nolo contendere and not to stand trial." The Governor further testified that he believed Mrs. Edison told the truth in the Laska trial and that she was innocent of the charge preferred against her.

Mr. Breitenstein, to whom I have made earlier reference, was associated with Mr. Carr in the practice of law until the latter was inaugurated as governor. They, together with John G. Reid, Esq., of their office, represented respondent in his appeal from the Oklahoma federal court. Mr. Breitenstein testified in behalf of respondent in this disciplinary proceeding. He is a lawyer of excellent report, capable above many, and has enjoyed Governor Carr's full confidence for many years. When Mr. Carr was United States district attorney for Colorado, Mr. Breitenstein was an assistant in that office. In testifying here he said he had known respondent for fourteen years, knew him well, and had found him to be wholly reliable, and a man whose word was always dependable; that Mr. Laska's reputation in the community as a law-abiding citizen and attorney was good. That while he and his associates did not represent respondent at his trial, he was in attendance when sentence was imposed. A record of the proceedings was procured which he and Mr. Carr studied thoroughly. "After considering a transcript of the evidence and testimony produced in the trial, all the circumstances surrounding the trial, and the instructions of the court to the jury, it was our best judgment, both Mr. Carr's and mine," testified Mr. Breitenstein, "that Mr. Laska had not had a fair trial." He stated further that Mr. Reid

shared their views; and added that he and his associates were still of that opinion.

Mr. Horace N. Hawkins, in practice in Colorado nearly fifty years, who, in the opinion of many, shares leadership of our bar only with a few, and who is recognized as a fearless and just man and lawyer, testified that he had known respondent practically through the latter's professional life, and held him in high regard as a lawyer and citizen. That respondent's reputation for veracity and devotion to high standards was good. Giving attention to the record of respondent's trial in the federal court, Mr. Hawkins said that he shared the views of lawyers generally, to the effect that respondent was unjustly treated and had not received a fair trial. By way of emphasis, he added that, considering the favor enjoyed by Clara and Ed Feldmann at the hands of the court after respondent's conviction, "a man would be a fool not to know a deal had been made between the prosecuting officers and those witnesses."

Frederick E. Dickerson, member of the bar for seventeen years, formerly a state senator, testified that he had known Laska eleven of those years, and that the latter's reputation was excellent, that he was honorable in his dealings and in his professional life; that he was charitable and kindly disposed toward all who were in trouble—frequently serving professionally the unfortunate and indigent, neither receiving nor expecting compensation. This witness remarked on the record of Laska's trial, and emphasized the unfairness of the court in stifling comment concerning the witnesses Feldmann. "It was obvious," said senator Dickerson, "that there had been some prearrangement between the witnesses and the prosecutor," and that Laska "was unfairly dealt with" was apparent.

Ralph J. Cummings, a practicing attorney for sixteen years, for several years a member of the Denver district attorney's office, and now a state senator, stated that he knew the respondent well, that he is an excel-

lent lawyer, represents his clients ably, that his word is to be relied upon, and that his acts were "always consistent with the administration of justice." Senator Cummings expressed himself as regarding the treatment accorded respondent in his trial to be unfair, and stated that lawyers generally entertained the view that Laska did not have an impartial trial.

Mr. Dudley W. Strickland, a member of the bar for more than forty years, testified that he had known Laska twenty-five years or longer, that he always conducted himself in a perfectly proper and ethical manner, and that his general reputation in the community as a peaceful and law-abiding citizen was excellent; that the record of his trial clearly indicated he had not been accorded fair treatment generally, and that the release of the confessing Feldmanns immediately on the incoming of a verdict of guilty against respondent but lent emphasis to the unfair ruling of the judge in refusing Laska's counsel the right to comment as to these witnesses and their unlikely tales.

Mr. Walter M. Appel, an attorney thirty-eight years in Denver, who has known Laska for more than twenty-five years, testified that his reputation in the community as an honorable and law-abiding citizen and lawyer is excellent, and that his word is "as good as gold." Said he, "I regard Mr. Laska as a very honorable, high type of lawyer." Mr. Appel further stated that although he did not represent Laska at any time, he joined Mr. Carr and Mr. Breitenstein in an examination of the record of the federal court proceedings, and concluded, as did those two gentlemen, that respondent had not been accorded a fair trial, and that he "couldn't possibly understand why that case was not reversed." "Messrs. Carr and Breitenstein," said Mr. Appel, "were convinced that there had been a "miscarriage of justice, a very substantial one, and so expressed themselves frequently," a view which he shared.

Jack Carberry, a newspaper man in Denver for thirty

years, and whose assignments were such that he was in constant contact with the administration of justice in the courts, and who had covered perhaps hundreds of criminal cases, stated that he and all newspapermen familiar with the Laska case, as well as many lawyers of his acquaintance, and with whom he had discussed the matter, were agreed that defendant did not have a fair trial. Mr. Carberry emphasized Mr. Laska's charitable attitude toward those who were not able to employ counsel, remarking that he never withheld a helping hand—even expending his own funds—where his services would aid in promoting justice. Mr. Carberry said that releasing Mathers, the Oklahoma lawyer, and convicting Laska, the Colorado lawyer, was a "hometown decision."

Paul Gregg, Denver newspaper man for a third of a century, testified that he knew respondent well, regarded him highly, and that his reputation as a citizen and a lawyer is good. He said that he, in common with newspapermen generally, believed Laska did not have a fair trial.

Hazel Ohle, secretary in Mr. Laska's office for many years, and who, because of illness, did not attend the trial in Oklahoma, testified in this proceeding. She said that she saw Ed Feldmann give Mr. Laska $3,000, as Laska and Mrs. Edison stated at the trial, and that at her employer's request she and Mrs. Edison counted the money, remarking, as did Mrs. Edison, that the amount was slightly less than the sum it purported to be.

Leo J. Crowley, Denver attorney for fourteen years, formerly United States Commissioner for Colorado, and now a state senator, testified that he had known Laska many years, and that his word could always be relied upon; that he attended the trial in the Oklahoma federal court as a government witness, and, describing the scene, and trial setting, stated that in his view Laska

neither had nor could have had a fair trail in that jurisdiction.

Ray Humphreys, chief investigator in the Denver district attorney's office for eight years, testified that he had known Laska well for twenty years or more, particularly in connection with cases in which respondent appeared as counsel in opposition to the district attorney, and with whom the witness was associated. Always, said Mr. Humphreys, Mr. Laska represented his client ably and honorably throughout. His word was dependable, and his reputation in the community as a truthful, law-abiding citizen was above reproach.

Honorable Ira C. Rothgerber, Denver attorney thirty-eight years—eight years as Denver county judge, just preceding Judge Luxford's service in that important position, testified that respondent practiced actively in his court, and that at all times and in all things he was "highly reliable, highly honorable, and had the respect of the bar of Denver and the judges;" that he constantly exemplified high standards, and his reputation as a law-abiding citizen and an honorable member of the bar through the years was good. He added, the general trend of thought of lawyers was that Mr. Laska did not receive a fair trial.

Honorable George A. Luxford, Denver attorney for many years, and county judge for sixteen years in immediate succession to Judge Rothgerber, testified he had known respondent about twenty-five years, and for the full period of his service as judge respondent had practiced actively in his court. "He was a very competent, capable, straightforward lawyer, courteous to the court, served his clients well, and did everything that the profession would expect of a high-class lawyer," and that "his reputation for being an honorable and upright member of the bar is good."

The Circuit Court of Appeals, Tenth Circuit, in its judgment in the Laska case (82 F. [2d] 672), as I am convinced, erred in the exercise of its admitted jurisdic-

tion. Appelate courts, even as our own, are not free from error. The point here is that we should not follow the erroneous decisions of another court when they are not binding upon us, and which clearly are contrary to the evidence, the law, and justice. That that tribunal was not altogether happy in its judgment appears from a sentence of its opinion presently to be quoted, the first word of which I emphasize. In its discussion of the facts, the court, charily omitting reference to the record which made certain the utter unreliability of the testimony of the Feldmanns, goes into much detail in stating what they had said about Laska. Having thus "built up" the case against respondent, the most critical statement in which it seemed willing to indulge was, that "*If* he did these things, he deliberately entered 'as black a conspiracy as was ever hatched, and he ought to pay the penalty." Employment of the emphasized word was equivalent to withholding endorsement of the fact. Webster. My brethren here, making no analysis of the record, content themselves with quoting the same sentence, including the "IF," from the federal court opinion, and on that pillar of sand predicate judgment of disbarment against respondent.

My conclusion is that Laska's trial in the federal court was a travesty, and his imprisonment cruel and inhuman. Judgment of disbarment in this proceeding is a fitting climax to what preceded.